**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|                                   |   |                 |
|-----------------------------------|---|-----------------|
| In the Matter of the Extradition of | ) | 3:24-MJ-102   |
|                                   | ) |                 |
|                                   | ) |                 |
| Leikeze Tyreke Kibet Cheruiyot    | ) |                 |
|                                   | ) |                 |

**MEMORANDUM OF EXTRADITION LAW
AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations and acting at the request of the government of Canada, respectfully requests that the fugitive in this case, Leikeze Tyreke Kibet Cheruiyot ("Cheruiyot"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Cheruiyot should be detained. In short, Cheruiyot should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he is not a flight risk, not a danger to the community, and that special circumstances warrant his release.

**PROVISIONAL ARREST BACKGROUND**

Authorities in Canada seek Cheruiyot's extradition so that he may be prosecuted for (1) one count of aggravated sexual assault in violation of Section 273(1) of the Criminal Code of Canada ("CCC"); (2) one count of aggravated assault in violation of Section 268 of the CCC; (3) one count of breaking and entering in Section 348(1)(b) of the CCC; (4) one count of sexual assault in violation of Section 271 of the CCC; and (5) two counts of forcible confinement in violation of Section 279(2) of the CCC.  A Canadian warrant for Cheruiyot's arrest was issued on September

18, 2024 for these charges, by the Justice of the Peace Fabiano Mendes of the Ontario Court of Justice.  Canada presented the following facts as the basis for its request for provisional arrest with a view toward extradition:

A.  **July 13, 2022 Assault of Victim A**

On July 13, 2022, at 9:39 a.m., a witness called 911 to report an assault on a woman in William Schwenger Park in Hamilton, Ontario.  Police and paramedics reported to the scene and found the victim, hereinafter "Victim A", with her hands bound behind her back with zip ties.  Victim A was transported to the hospital due to several injuries she had sustained, including a black eye, vision issues, scratches and bruising, two broken ribs, muscle damage, and a strained neck and back.  Victim A was released from the hospital the following day, on July 14, 2022.

That same day, on July 14, 2022, Victim A provided a statement to the Hamilton Police Service ("HPS").  She told authorities she went for a walk at the William Schwenger Park around 7:40 a.m. on the morning of July 13, 2022.  Approximately 20 minutes into her walk, an unknown male wearing a black surgical mask attacked her from behind and dragged her backwards off the paved trail and into a wooded area.  The assailant bound her hands behind her back with a zip tie and gagged her mouth with a piece of fabric, while punching her in the face and the side of her torso.  After an unknown period of time, the assailant stopped hitting Victim A and got off of her.  At that point, Victim A spit out the gag from her mouth.  The suspect then began punching the victim again while repeatedly staying "fuck you."  He replaced the gag in her mouth and attempted to roll her onto her stomach, but Victim A successfully resisted.

The attack ended when they heard the sound of female voices nearby.  The assailant left the victim tied up in the woods and fled on foot.  Victim A told authorities that she believed the

suspect would have sexually assaulted her had the attack not been interrupted.

Victim A described her assailant as a black male, 22 to 25 years of age, with a fit/slim build and short black hair, who was wearing all dark clothing and a black surgical mask.

The witness who called 911 from William Schwenger Park on July 13, 2022, and her mother, who was also present at the scene, provided statements to HPS that same day.  Both witnesses said they were walking on the trail at William Schwenger Park that morning when they encountered a black male looking on the ground in a grassy area.  The male advised the witnesses that he was looking for his eyeglasses, and they unsuccessfully helped him look for them.

The witnesses told authorities that, as they began to walk away, they heard a noise they believed belonged to a woman or a child.  They walked back towards where they had encountered the man looking for his glasses, and one witness headed down a side path to the wooded area in attempt to locate the source of the noise.  That witness located the male with whom she had just interacted on top of a female, Victim A, who was screaming, "He's raping me."  The man got up, told the witness that he had found the victim in that condition, and walked away, leaving Victim A in the wooded area with her hands still bound behind her back.

The witnesses described the man as a black male, 18 to 24 years of age, with an athletic build and black curly hair, who was wearing a black 'COVID' mask, a dark colored t-shirt, and baggy black pants.

Officers who responded to the scene recovered a pair of black eyeglasses from the area where the witnesses said the male had been looking for glasses.  Authorities swabbed the eyeglasses and underneath Victim A's fingernails and sent the samples to a forensics lab for testing.  On July 22, 2022, the forensics lab informed HPS that the DNA profile from the eyeglasses

and the victim's fingernails were a match to the same male, who was then unknown in the National DNA Databank of Canada.

Between July 13, 2022, and August 4, 2022, authorities were able to collect surveillance footage on consent from homeowners and businesses near the site of the attack of Victim A. According to the surveillance footage, a male matching the descriptions provided by the victim and witnesses was observed in the area of the attack at approximately 7:17 a.m. and seen fleeing William Schwenger Park at 9:40 a.m., a mere minute after the eyewitness had called 911.  The footage showed the male running north and west away from the park using a trail system and side streets.  Police showed the two eyewitnesses surveillance photos, and they both identified the man in the photos as the man they saw in the park on July 13, 2022.

### B.  August 7, 2023 Assault of Victim B

On August 7, 2023, at approximately 4:10 a.m., Canadian police received a 911 call to respond to the site of an alleged sexual assault at a residence in Hamilton, Ontario.  Officers went to the residence, and the victim, hereinafter "Victim B", provided a statement.

Victim B said that, around midnight, she had gone downstairs within her residence to sleep on the couch.  She said both her front door and side entrance were unlocked, which was not unusual.  At approximately 3:00 a.m., she was asleep on the couch when she was awoken to her covers being lifted.  She turned over and saw a man she did not know standing beside the couch peering at her.  While she was still on the couch, the intruder said, "when I cum, I'll leave."  Victim B said the intruder undressed himself but kept his hoodie on to conceal his identity.  He then undressed her, leaving her in only her underwear and bra.  The intruder instructed Victim B to lay down on the couch, but she was unable to do so due to a bad hip on which she was waiting to have

4

surgery.  The intruder then had her perform oral sex on him for approximately one hour, during which he pulled her right breast out of her bra and touched her nipple.  At some point, the intruder asked Victim B whether he could insert his penis into her vagina, but she declined, stating that her hip was too sore.

Victim B told authorities that the intruder was complimentary towards her and told her that he had a hard time with relationships because he was attracted to older women.  When he had Victim B stop performing oral sex, the intruder told Victim B that she did a good job.  He also said that he had been angry when he arrived but was no longer angry.  Victim B said that, on his way out, the intruder asked if he could come back the next night.  She agreed to his proposal in an effort to get him out of her residence.  As soon as he left, Victim B called 911.  She was transported to a hospital, where a sexual assault examination kit was completed.  A swab was also taken from Victim B's right nipple, and the swab was submitted to the forensics lab for testing.

### C.  Identification of CHERUIYOT

On January 3, 2024, the forensics lab confirmed that the DNA profile from the swab of Victim B's nipple matched both the DNA profile from the swab underneath Victim A's fingernails and of the eyeglasses found at the scene of the assault of Victim A.  Based on this match, Canadian authorities concluded that the same male suspect was responsible for the attacks on Victim A and Victim B.

On July 19, 2024, the eyeglass lenses found at the scene of Victim A's attack were tested by a registered optician at the University of Waterloo School of Optometry and Vision Science to determine the prescription.  Canadian authorities then sought and obtained a production order from the manufacturer of the eyeglass frames to produce all customer records for individuals who had

ordered the combination of eyeglass frame model and prescription over the prior five and a half years.  The records confirmed that four customers within the city of Hamilton, Ontario, had ordered that combination of frame and lens prescription.  Two customers were female, one customer was a white male, and the fourth customer was identified as Cheruiyot.

After a search of Cheruiyot's name and driver's license records, HPS determined that Cheruiyot matched the physical description of the suspect in both the July 13, 2022, and August 7, 2023, offenses.  It was also determined that Cheruiyot's last known address was northwest of where Victim A was attacked, which is the same direction in which the male suspect was seen on surveillance footage fleeing the scene, and in the same neighborhood as Victim B's residence.

After authorities were unable to locate Cheruiyot at his last known address in Ontario, police contacted the Canada Border Services Agency, which informed police that Cheruiyot had left Canada and entered the United States on September 15, 2023, only a month after the attack of Victim B, and had not returned to Canada since.  On August 28, 2024, HPS learned from U.S. law enforcement that Cheruiyot had eventually settled in the area of Richmond, Virginia, near where his aunt resides.[1]  HPS further learned from local law enforcement in the Richmond area that Cheruiyot had been the subject of another criminal investigation around that same time relating to his conduct in Virginia.

On September 17, 2024, HPS officers traveled to Virginia to observe U.S. law enforcement obtain "cast off" DNA from Cheruiyot.  Specifically, officers observed Cheruiyot, who an HPS

---

[1] Although Cheruiyot has an aunt living in the greater Richmond area, according to the officers who conducted 24/7 surveillance of Cheruiyot, he was not residing with, nor did he visit, his aunt. Rather, he was living out of his car, primarily parking it in either the Gold's Gym parking lot or library parking lot overnight where he slept in his car. Cheruiyot has been in state custody at the Henrico County Regional Jail West for almost a month as of the time of the present filing.

officer identified as the same person in Cheruiyot's driver's license photo, drinking from a water jug.  Authorities seized the water jug from a table when Cheruiyot had walked away, swabbed it, and voluntarily turned over the evidence to HPS.  HPS then sent the swab to the Canadian forensics lab for testing.  According to a forensics report issued on October 3, 2024, the DNA profile from the swab of the mouth of the water jug was an almost certain match to the DNA profiles from the two crime scenes.  According to the report, it was more than one trillion times more likely that the source of the male DNA originated from Cheruiyot and not some unknown person, unrelated to him.  HPS concluded that Cheruiyot was therefore the person responsible for both sets of crimes described herein.

Accordingly, Canada sought Cheruiyot's provisional arrest, with a view toward extradition, pursuant to its extradition treaty with the United States.[2]  The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Cheruiyot's arrest.  This Court issued the arrest warrant, and Cheruiyot was arrested on November 1, 2024 in Henrico, Virginia.  Cheruiyot is currently in the custody of the U.S. Marshals Service.

---

[2] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, *as amended by* Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990); *and* Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (collectively, the "Treaty").

## APPLICABLE LAW

## I.   LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

The extradition process is *sui generis*, neither a criminal nor a civil proceeding.   The framework applicable to United States' extradition proceedings is described below, along with the Court's circumscribed role in the extradition process.

### a.   The Role of the Extradition Judge in Extradition Proceedings

Extradition is primarily an executive function with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge."  18 U.S.C. § 3184; *see also Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014); *Sidali v. I.N.S.*, 107 F.3d 191, 195 (3d Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998).   At the extradition hearing, the Court's limited role is to consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification are satisfied.   *Ordinola v. Hackman*, 478 F.3d 588, 597 (4th Cir. 2007); *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000).   If the Court finds that the requirements for certification have been met, the Court must furnish a certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender.   18 U.S.C. § 3184; *see Ordinola*, 478 F.3d at 609 (4th Cir. 2007); *Cheung*, 213 F.3d at 88.   The Secretary of State, and not the Court, makes the decision regarding whether the fugitive should ultimately be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Plaster v. United States*, 720 F.2d 340, 354 (4th Cir. 1983).   "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet

8

simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

### b.  The requirements for certification

At the extradition hearing, the Court's review is limited to determining whether: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.  *Mironescu v. Costner*, 480 F.3d 664, 665 (4th Cir. 2007); *Matter of Extradition of Etouman*, 533 F. Supp. 3d 312, 316 (E.D. Va. 2021); *see also Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006).  The following sections briefly discuss each finding the Court must make in order to issue the certification to the Secretary of State.

### i.  Authority of the Court over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States," but, rather, acts in a "non-institutional capacity by virtue of a special authority."  *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted).  Both magistrate judges and district judges may render a certification under Section 3184.  *See DeSilva v.*

*DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999); *Etouman*, 533 F. Supp. 3d at 316 (citing E.D. Va. Local Crim. R. 5; E.D. Va. Local Civ. R. 72)).

ii.   Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."); *Ye Gon*, 774 F.3d at 214.

iii.   Treaty in full force and effect

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States.  *See Hoxha*, 465 F.3d at 562; *Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637, 644 (W.D. Va. 2014).  The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the Department of State, attesting that there is a treaty in full force and effect between the United States and Canada.  The Court should defer to the Department of State's determination in that regard.  *United States ex rel Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997) ("[O]n the question whether [the extradition] treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance" (quoting *Terlinden v. Ames*, 184 U.S. 270, 285 (1902)); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

iv.   Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Article 1 of the U.S.-Canada Treaty provides for the return of fugitives who have been charged with or convicted of an offense covered by Article 2 of the Treaty and that is committed within the territory of the requesting country.[3]  Article 2 of the Treaty defines offenses as extraditable if the alleged conduct is punishable under the laws of both the United States and Canada by "imprisonment or other form of detention for a term exceeding one year or any greater punishment."

Consequently, in assessing whether the crimes for which extradition is requested are covered by the Treaty, the court will examine the description of criminal conduct provided by Canada in support of its charges and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states.  *See Wright v. Henkel*, 190 U.S. 40, 61 (1903); *Zhenli Ye Gon*, 774 F.3d at 210; *Hu Yau-Leung v. Soscia*, 649 F.2d 917, 918 & n.4 (2d Cir. 1981).  A requesting country need not establish that its crimes are identical to ours.  *Zhenli Ye Gon*, 774 F.3d at 217.  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

Moreover, in fulfilling its function under Section 3184, the judicial officer should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely the surrender

---

[3] Although not applicable here, Article 3 of the Treaty provides conditions under which extradition may be granted for crimes committed outside the territory of the requesting state.

of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) ("The point of an extradition treaty after all is to facilitate extradition . . . .").

v.   <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Canada were committed by the person before the Court. Probable cause is established if there is "competent evidence to justify holding the accused to await trial." *Ordinola*, 478 F.3d at 608 (internal quotation marks omitted) (citing *Hoxha*, 465 F.3d at 561); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.") (internal quotation marks and citation omitted).

The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

### c.  The Extradition Hearing Follows Unique Procedures

#### i.   An extradition hearing is not a criminal proceeding

An extradition hearing is not a criminal proceeding.  Rather, its purpose is to decide the sufficiency of the charge under the Treaty, not to determine the guilt or innocence of the accused; that is for the foreign court.  *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901).  The limited nature of the hearing has resulted in special procedural and evidentiary rules.

Neither the Federal Rules of Criminal Procedure, nor Federal Rules of Evidence apply to extradition proceedings.[4]  *See Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011); *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008).  Moreover, the fugitive has no right to discovery.  *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).  The fugitive's right to present evidence is severely constrained, *Shapiro v. Ferrandina*, 478 F.2d 894, 900-01 (2d Cir. 1973); and his constitutional rights are limited, *see Atuar v. United States*, 156 F. App'x 555, 562 (4th Cir. Nov. 23, 2005) ("[extradition] proceedings are not designed to determine the guilt or innocence of the accused, and therefore, certain due process protections are simply not applicable.").  For example, the fugitive has no right to cross-examine witnesses, *Skaftouros*, 667 F.3d at 155 n.16; there is no Sixth Amendment right to a speedy trial, *Jhirad*, 536 F.2d at 485 n.9; *In re Extradition of Mitchell*, 625 F. Supp. 3d 481, 498 (N.D.W. Va. 2022) (collecting circuit court cases all holding that there is no right to speedy trial in extradition cases); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996)

---

[4] Fed. R. Crim. P. 1(a)(5)(A) states: "Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."  Fed. R. Evid. 1101(d)(3) provides: "These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."

(citing *Collins*, 262 U.S. at 429); the exclusionary rule does not apply, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and the fugitive does not have the right to confront his accusers, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

ii.   <u>Extradition hearings rely on written submissions and do not require live witnesses</u>

A certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Skaftouros*, 667 F.3d at 155 n.16. Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *Shapiro*, 478 F.2d at 902. Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517. Further, hearsay evidence is admissible at an extradition hearing and may fully support the Court's findings leading to a certification under Section 3184. *Collins*, 259 U.S. at 317; *Hoxha*, 465 F.3d at 561.

iii.   <u>The fugitive's ability to submit evidence is limited</u>

Due to the nature and limited purpose of an extradition hearing under Section 3184 and the importance of the international obligations of the United States under an extradition treaty, a fugitive's opportunity to challenge the evidence introduced against him is very circumscribed. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country but may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 457-58; *Hoxha*, 465 F.3d at 561; *In re Extradition of Atuar*, 300 F. Supp. 2d 418, 427 (S.D. W. Va. 2003). A contrary rule might compel the "demanding government to produce all its evidence … both directing and rebutting, in order to meet the defense thus gathered

14

from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).  The admission of such explanatory evidence is largely within the discretion of the Court.  *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (citing *Collins*, 259 U.S. at 315-17); *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir.1991).

Courts routinely reject technical and affirmative defenses in extradition proceedings.  *See Bingham*, 241 U.S. at 517 (rejecting objections that "savor of technicality"); *Shapiro*, 478 F.2d at 901.  These issues, which require factual or credibility determinations, are for the courts in the requesting country to resolve at trial.

iv.    Rule of non-inquiry: all matters other than those relevant to certification
       are reserved for the Secretary of State

All matters a fugitive might raise as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not the Court.  *See* 18 U.S.C. §§ 3184, 3186.  This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's "powers to conduct foreign affairs."  *See In re Kaine*, 55 U.S. 103, 110 (1852).

Accordingly, the Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country.  *See Mironescu*, 480 F.3d at 666; *Atuar*, 300 F. Supp. 2d at 426; *see also Jhirad*, 536 F.2d at 484-85 ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.").  Similarly, a fugitive's contention that the extradition request is politically motivated or that the requesting state's justice system is unfair, should be addressed by the Secretary of State, not the Court.  *Koskotas*, 931 F.2d at 175 (motives of

requesting state is a matter for consideration by the executive branch); *In re Extradition of Mackin*, 668 F.2d 122, 133 (2d Cir. 1981); *Sindona*, 450 F. Supp. at 693.

## DETENTION ARGUMENT

**I.   CHERUIYOT SHOULD BE DETAINED**

  **a.   Applicable law**

    i. <u>A strong presumption against bail governs in an international extradition proceeding</u>

  The federal statutes governing extradition, 18 U.S.C. §§ 3184 *et seq.*, do not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[5]  *See Collins*, 259 U.S. at 316; *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 597 (W.D. Va. 2013).

  Rather, unlike in domestic criminal cases, there is a "powerful presumption against bail" in international extradition cases.  *United States v. Zarate*, 492 F. Supp. 2d 514, 515 (D. Md. 2007) (citing *Wright*, 190 U.S. 40); *see also United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986). "[B]ail should be granted only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."  *Leitner*, 784 F.2d at 160 (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

  This presumption against bail is rooted in *Wright v. Henkel*, where the Supreme Court explained that when a foreign government makes a proper request under a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

---

[5] The Bail Reform Act applies only to "offenses" against the United States that are triable in U.S. courts.  *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, the fugitive is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed against the requesting state, Canada.

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling.  When, as here, Canada meets the conditions of the Treaty, the United States is obliged to deliver the fugitive.  It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States.  Such reciprocity would be defeated if a fugitive flees after being released on bond.  *See id.*; *see also Leitner*, 784 F.2d at 160-61 (explaining that the United States has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presentence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave Canada without either remedy or compensation.

ii.   Fugitives must establish "special circumstances" and must also demonstrate that they are neither a risk of flight nor a danger to the community for the court to consider the question of bail

In light of the strong presumption against bail established in *Wright*, a fugitive may not be released on bail unless he demonstrates that (1) he is neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant his release.  *See, e.g.*, *Leitner*, 784 F.2d at 160; *Nezirovic*, 990 F. Supp. 2d at 599-600 ("Under the special circumstances standard, admission

17

to bail should be an unusual and extraordinary thing, and courts should exercise the power sparingly.") (internal quotation marks and citations omitted).  "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act."  *In the Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).  Moreover, the burden is on the fugitive to establish the existence of special circumstances by clear and convincing evidence. *Nezirovic*, 990 F. Supp. 2d at 599, n.1 (citing cases).

Significantly, a fugitive charged with crimes in another country is already by definition in flight or deliberately absent from that jurisdiction.  *In re Extradition of Lagadec*, 386 F. Supp. 3d 629 (E.D.N.C. 2019).  In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010); *In re Extradition of Shaw*, No. 14-MC-81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee.").

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight.  *Leitner*, 784 F.2d at 160; *Nezirovic*, 990 F. Supp. 2d at 598; *see also Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 130 (E.D.N.Y. 2001) ("Absence of risk of flight is not a legally cognizable 'special circumstance' justifying release from bail.") (citing cases).  Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.  *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1221 (D. Nev. 1993).

18

Where a fugitive claims special circumstances, courts consistently agree that they must be "extraordinary and not factors applicable to all defendants facing extradition." *Lagadec*, 386 F. Supp. 3d at 629 (stating that special circumstances must be "'extraordinary and not factors applicable to all [fugitives] facing extradition'") (quoting *Nezirovic*, 990 F. Supp. 2d at 599); *see also, e.g.*, *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 472 (S.D. Tex. 2010) ("special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees.").

Courts have considered and rejected a lengthy list of would-be special circumstances – among them:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney or participate in pending litigation, *see, e.g.*, *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992); *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1300, 1305 (S.D. Fla. July 7, 2017); *In re Extradition of Saldana*, No. 09-MJ-00014-P, 2009 WL 2134377, at *3 (W.D. Tenn. July 10, 2009) (stating that a fugitive's character and background "are typically not considered special circumstances on their own, but are more often considered in regard to risk of flight and danger to the community, rather than as a special circumstance") (internal quotation marks, citations, and alterations omitted);

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Nezirovic*, 990 F. Supp. 2d at 602; *Lagadec*, 386 F. Supp. 3d at 630; *In re Extradition of Rouvier*, 839 F. Supp. 537, 541–42 (N.D. Ill. 1993); *In re Extradition of Huerta*, No. H–08–342M, 2008 WL 2557514, at *2 (S.D. Tex. June 23, 2008);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 17-cv-00861, 2017 WL 1197855, at *4 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Knotek*, No. 13-9204 BRO, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *Borodin*, 136 F. Supp. 2d at 131; *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989); *In re Extradition of Nagy*, No. 1:17MJ3283, 2017 WL 6558487, at *4 (N.D. Ohio Dec. 21, 2017) (stating that fugitive "cannot complain of the passage of time when he has been a part of the reason the time has passed"); *Antonowicz*, 2017 WL 1197855, at *3; *Nezirovic*, 900 F. Supp. 2d at 604 (normal passage of time inherent in litigation not special circumstance); *Lagadec*, 386 F. Supp. 3d at 630 (rejecting claim concerning France's delay); and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 2017 WL 1197855, at *3; *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 172 (S.D.N.Y. 2009); *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1386-87 (D. Nev. 1995).

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### b. Argument

The Court should deny any request for bail in this case. As an initial matter, Cheruiyot is a danger to the community and should not be released. He is facing serious charges for violent

sexual offenses in Canada, in which he is accused of committing two predatory sexual assaults on women who are unknown to him.  Further, these assaults involved an attempted kidnapping (binding, gagging, and dragging Victim A into a secluded wooded area) and breaking into a residence.  Cheruiyot has also exhibited a pattern of predatory sexual criminal behavior after his relocation to the Richmond area, as reflected by the indecent exposure, simulated masturbation, and trespass after forbidden charges (19 total charges) brought against him in the City of Richmond and Henrico County.[6]  The danger that Cheruiyot poses to the community, on its own, makes him an inappropriate candidate for bail.

Moreover, Cheruiyot is a flight risk.  Indeed, the fact that Cheruiyot absconded from Canada shortly after the attack on his second victim is highly indicative of his risk of flight were he to be released on bond here.  *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges.  The intent is the same—the avoidance of prosecution.") (citing *Jhirad*, 536 F.2d at 483).

Additionally, the strength of Canada's case, the government's relatively low burden of proof in extradition hearings, and the prospect of serving a lengthy prison sentence, all provide

---

[6] The 15 Richmond charges were related to Cheruiyot's repeated instances of public masturbation including as many as seven instances of masturbation in a public library. Although Cheruiyot was initially released on bail on September 20, 2024, in those Richmond cases, immediately following his release, on September 20-22, 2024, Cheruiyot repeatedly trespassed at an apartment complex in Henrico, including at least one instance where he masturbated while watching a female resident work out. On September 25, 2024, Henrico brought four new charges against Cheruiyot, after which, on September 26, 2024, Richmond moved to revoke Cheruiyot's bail. After the United States secured an arrest warrant pursuant to its Complaint for Provisional Arrest with a View Toward Extradition, Richmond and Henrico nolle prossed the then pending state charges.

Cheruiyot with a significant incentive to flee.  *See*, *e.g.*, *In re Extradition of Adame*, 2013 WL 1222115, at *3  (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *see also*, *e.g.*, *In re Extradition of Shaw*, 14-mc-81475-WM, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."). Accordingly, allowance of bail in any amount or bond would not guarantee Cheruiyot's presence in Court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Because the fugitive is a flight risk, the Court need go no further in order to deny any forthcoming application for bail.  However, even if the Court were satisfied that the fugitive is not a flight risk, the Government is unaware of any "special circumstances" that would justify bail in this case.  Allowing bail under any conditions, would not reasonably ensure Cheruiyot's presence in court and would invite the possibility of embarrassing the United States in conducting its foreign affairs.[7]

---

[7] Should the Court be inclined to grant bail or bond in this case, the United States respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances."  Moreover, in order to protect the ability of the United States to meet its treaty obligations to Canada, the United States also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order so that the United States can consider the matter of whether, under the circumstances, to seek a stay pending possible appeal on the bail issue.

**CONCLUSION**

For the foregoing reasons, the United States requests that Cheruiyot be detained pending resolution of the extradition proceedings.

Dated: November 1, 2024                    Respectfully submitted,

                                           JESSICA D. ABER
                                           United States Attorney

                          By:              _____/s/_____

                                           Carla Jordan-Detamore
                                           VA Bar No. 85934
                                           Assistant United States Attorney
                                           United States Attorney's Office
                                           919 E. Main Street, Suite 1900
                                           Richmond, Virginia 23219
                                           (804) 819-7426
                                           Carla.jordan-detamore@usdoj.gov